## Case No. 17,440.

### The WESTERN METROPOLIS.

[6 Blatchf. 210.] [1]

Circuit Court, S. D. New York. Oct. 9, 1868.

COLLISION—STEAMER AND SAILING VESSEL—ONUS OF PROOF—CHANGE OF COURSE IN EXTREMIS.

1. Where it is the duty of a steamer to avoid a sailing vessel, the onus is on the steamer to show. in case of a collision. that the sailing vessel did not keep her course. or to show some other fault on the part of the sailing vessel, that contributed to the collision.
[Cited in The H. P. Baldwin. Case No. 6,812; The Cyclops, 45 Fed. 124.]

2. Where the change of course by the sailing vessel is made under impending danger and in extremis, the steamer is responsible for it.
[Cited in The H. P. Baldwin, Case No. 6,812; Farr v. The Farnley, 1 Fed. 637; Ladd v. Foster, 31 Fed. 831.]

3. The duty of a steamer, at night, not to approach too near to a sailing vessel, in meeting her, when there is room to give her a wide berth, enforced.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, filed in the district court, by the owners of the schooner Mary C. Town, against the steamer Western Metropolis, to recover for the damages sustained by the schooner, in a collision which happened between the two vessels, about 8 o'clock p. m., on the 10th of February, 1864, on the Potomac river, a few miles above Blackstone's Island and lighthouse. The district court dismissed the libel [case unreported], and the libelants appealed to this court.

Dennis McMahon, for libelants.
Charles Donohue, for claimants.

NELSON, Circuit Justice. The steamer was coming up the river. The schooner was going down, with the wind northerly, so that she had it nearly full, and was moving at the rate of about eight knots an hour. The steamer was going at half speed, about five knots. intending soon to anchor. The night was not dark, the steamer having been seen some four or five miles ahead, by the hands on the schooner. and the schooner having been seen by the steamer some one and a half or two miles off. though there is some diversity of opinion among the hands on board of the steamer. Each vessel. however. saw the other in time to adopt. and follow out, proper measures to avoid the disaster. As it was the duty of the steamer to avoid the schooner in passing, assuming that the latter kept her course, the onus rests on the steamer to show that the schooner did not keep her course. or to show some other fault that contributed to the collision. This the steamer has undertaken to do; and she insists. that the schooner changed her course, as the two vessels approached each other. and thereby defeated the movement of the steamer, by starboarding her helm, to pass the schooner in safety, and go under the schooner's stern, the latter porting about the same time. and giving way in the same direction. The whole defence turns upon this position. The court below found the schooner in fault. and dismissed the libel on this ground. After the best examination I have been able to give to the case. I regret to say. that I cannot concur in this opinion. I am forced to the conclusion. that this movement of the schooner was made under impending danger. and in extremis, and was one for which the steamer must be held responsible.

The clear weight of the proofs is, that the

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]

steamer was within from 300 to 400 yards of the schooner, and nearly dead ahead, when the latter ported her helm. The combined speed of the two vessels was about 12 or 13 miles an hour. They must have come together in a minute and a quarter, or less than two minutes, after the change of course by the schooner. There were five hands on the schooner, including the master, all of whom were on deck and witnessed the collision, and maintain this account of it. In addition to this, five of the hands on board of the steamer, including the pilot, have been examined for the libellants, and confirm it. So do the master, the second mate, and the wheelsman of the steamer, who were examined for the claimants. The master, Hilton, says that the schooner was a mile, more or less, off when he discovered her, but he would not name the distance; that it was a very short time afterward, but he would not say how short, that the collision occurred; and that it occurred a very short time after the schooner changed her course, but he would not say how short, although pressed by the counsel for the libellants. This master seems to have been quite uninformed as to his duties. He says that if two vessels, one a steamer and the other a sailing vessel, are approaching head and head, it is the duty of each to port and go to the right; and that there is no distinction between a steamer and a sailing vessel and two steamers, as to the duty. The second mate, Cowen, says, that he went up on the forecastle, on hearing the schooner reported; that he then first saw her; that it was about five minutes after he saw her that the collision occurred; that the schooner was about a quarter of a mile off when he first saw her; and that she was very close when she crossed the steamer's bows. He adds: "As near as I can judge, she, the schooner, was not more than the length of our ship, 250 or 300 feet off, when she altered her course." Again, he repeats, in answer to the question: "Q. About how far off was the schooner from you when she commenced to put her helm to port? A. I judge somewhere between 250 and 300 feet." The quartermaster, Kain, who was at the wheel, says, that the schooner was a very short distance off when he first saw her; and that the master blew the whistle a very short time after this. To the question, "Q. How long was it after blowing the whistle, that the schooner kept away," he answers, "A. Right away. Q. How soon? A. Quick as thought. Q. She had not kept away before that, had she? A. No, sir." The same witness states: "I put the wheel hard-a-starboard by his, the captain's, orders. Q. Before or after the whistle blew? A. Immediately after the whistle blew."

Now, this testimony strongly corroborates the account of the collision given by the hands on the schooner. To them the steamer appeared to be approaching nearly ahead, and, as she neared them without any indications of a change of course, it is not surprising that some alarm should have existed on board of the schooner. Her master says, that, in this state of anxiety, and when a collision seemed almost inevitable, he heard the whistle of the steamer—one long blast—which he took to mean, or indicate, that the schooner should go to the right, and that he immediately ported her helm and bore away. The hands on the schooner say, that, at this point of time, the steamer was only some 300 or 400 yards off. The master of the steamer says, that the collision was a very short time after the change of the course of the schooner. The second mate of the steamer says, that the schooner was only 250 or 300 feet off when the change took place; and the quartermaster, who was at the wheel on the steamer, says, that the schooner did not change her course till after the captain blew the whistle. This last witness also says, that the schooner was but a very short distance off when he first saw her; that the whistle was blown a very short time after this; that it was still later when the schooner first changed her course; and that he did not starboard his helm, or make any change in the course of the steamer, until after the whistle was blown. The pilot of the steamer agrees with the hands on the schooner, that the latter was not over 300 yards off when she changed her course. According to his account of the transaction, the schooner, when her light was first discovered, was supposed by him, and the master, to be a vessel at anchor, and they steered directly toward her, till they discovered she was under way, when they starboarded their helm.

Upon the whole, I feel a very strong conviction, on the evidence, that the steamer, before changing her course, had approached so near to the schooner, that there was not only a well-grounded fear of a collision, but actual danger of it. This must be so, whether the weight of it be regarded as establishing that the change of course by the steamer took place when the distance between the two vessels was 300 or 400 yards, or according to the master of the steamer and some of her hands, a very short time after the schooner changed her course, or when the schooner was some 250 or 300 feet off, as stated by the wheelsman. It is not surprising, when we take into account the disparity in the size and momentum of the two vessels, the steamer being of 2,500 tons, and the schooner of 150, that, on their approaching within 300 or 400 yards distance of each other, which, at their combined speed, would cause them to meet in less than two minutes, or, according to the distance as fixed by the wheelsman of the steamer, within about as many seconds, some alarm should exist on board of the schooner; and, even if her change of course was in a direction that contributed to the disaster, which is doubtful, the fault must be attributed to the steamer. The river, at the place of the collision,

is from four to five miles wide. There was, therefore, no excuse for the near approach of the steamer to the schooner, in passing her. There was abundance of room, clear of all obstructions, for the steamer to pass, and give to the schooner a wide berth. The truth seems to be, that the schooner was not discovered by the steamer until she was very near. The master, though strongly pressed, would not say that she was a mile off; and some of the hands say half a mile. The evening was not dark, and a vessel's lights could have been seen two or three miles without difficulty. Some ill feeling seems to have existed between the master and the pilot of the steamer. Both of them, according to the proofs, were engaged in giving orders at the time of the disaster; and the master strongly intimates that the pilot was incompetent. Still, the wheelsman says that he took his orders from the pilot, and the lookout says that he communicated with the pilot, and even the master, Hilton, says, that he obeyed the pilot's orders.

The decree below must be reversed, and a decree be entered for the libellants, with a reference to ascertain the damages.